UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

| | | |
|---|---|---|
| TODD PELLETIER, | ) | |
| | ) | |
| Plaintiff | ) | |
| | ) | |
| v. | ) | 1:10-cv-00282-JAW |
| | ) | |
| SOCIAL SECURITY ADMINISTRATION COMMISSIONER, | ) ) | |
| | ) | |
| Defendant | ) | |

## REPORT AND RECOMMENDED DECISION

The Social Security Administration found that Todd Pelletier suffers from disabling epilepsy but that substance use contributes to a disabling level of impairment. These findings resulted in a denial of Pelletier's application for disability insurance and supplemental security income benefits under Title II and Title XVI of the Social Security Act. Pelletier commenced this civil action to obtain judicial review of the final administrative decision. I recommend that the Court affirm the administrative decision.

### The Administrative Findings

The Commissioner's final decision is the October 15, 2009, decision of Administrative Law Judge Katherine Morgan because the Appeals Council "found no reason" to review the Judge's decision. (R. 8.[1]) Judge Morgan's decision tracks the familiar five-step sequential evaluation process for analyzing social security disability claims.

At step 1 of the sequential evaluation process, the Judge found that Pelletier met the insured status requirements of Title II through March 31, 2008, and has not engaged in substantial gainful activity since February 1, 2003, the alleged onset date. (Findings 1 & 2, R.

---
[1] The administrative record ("R.") in this case consists of two bound paper files.

21.)

At step 2, the Judge found that Pelletier has the following severe physical impairments: epilepsy and alcohol and marijuana abuse disorder. The Judge found that no severe mental impairment exists other than a substance addiction disorder. As for mental functioning categories, the Judge assessed only mild limitation in the areas of activities of daily living, social functioning, and concentration, persistence, and pace. The Judge found no evidence of extended episodes of decompensation or that decompensation would be predicted by an increase in mental demands. (Finding 3, R. 21.)

At step 3, the Judge found that this combination of impairments meets or equals listing sections 11.02 (epilepsy) and 12.09 (substance addition disorders) of the Commissioner's Listing of Impairments, Appendix 1 to 20 C.F.R. Part 404, Subpart P, due to the frequency of seizures (one or more per month). (Finding 4, R. 22-24.) The Judge was careful to explain that the evidence associated with significant or frequent seizure episodes also demonstrated alcohol use or abuse and subtherapeutic levels of medication, indicating Pelletier's failure to comply with his medication regimen. The Judge cited ample incidents of noncompliance, particularly insofar as alcohol use was concerned, as well as evidence that Pelletier was informed and knowledgeable about the fact that alcohol use lowered his seizure threshold. (R. 23.) The Judge additionally found that, if Pelletier "stopped the substance abuse, the remaining limitations would not cause more than a minimal impact on the claimant's ability to perform basic work activities." (Finding 5, R. 24.) The Judge rejected the opinion of a treatment provider that Pelletier was compliant with his medication plan and was not abusing alcohol and found that there was no persuasive evidence that the epilepsy would not be well controlled if the medication plan was followed and Pelletier abstained from substance abuse. (R. 24-25.) Because the record lacked reliable

evidence that a severe impairment in basic work function would exist in the absence of Pelletier's abuse of alcohol (and other substances), the Judge found that Pelletier was not disabled for purposes of the Social Security Act between the date of alleged onset and the date of the Judge's decision. (Finding 6, R. 25.) This finding precluded further evaluation of Pelletier's claim at steps 4 and 5 of the sequential evaluation process.

**Discussion of Plaintiff's Statement of Errors**

Pelletier argues that the Judge erred in regard to her residual functional capacity by conducting an independent diagnosis that alcohol abuse is contributory to a finding of disability. Pelletier also alleges error based on the Judge's rejection of the opinion of the treating physician, Dr. Enrique Feoli, M.D. (Statement of Errors at 11-13.) The following discussion provides the procedural and regulatory background for the Judge's decision, digests the material evidence of record, and concludes with a recommendation that the administrative decision be affirmed based on Pelletier's failure to demonstrate a disabling condition in the absence of a failure to follow prescribed treatment, including abstinence from alcohol. This recommendation differs slightly from the finding of the Judge by clearly placing the emphasis on failure to follow prescribed treatment rather than on the existence of a diagnosis of substance addiction disorder or alcoholism, for reasons that follow.

A. Background

This case involves two different sets of applications. Pelletier originally filed for Title II and Title XVI benefits in December 2004, alleging a disability onset date of February 1, 2003. These applications were denied by an administrative law judge on February 12, 2007, and Pelletier sought further review. Meanwhile, in April 2007, Pelletier filed new applications and

the Administration determined that Pelletier has been disabled beginning February 13, 2007.[2] (R. 18.) These inconsistent claims decisions came to the attention of the Appeals Council during its administrative review of the Judge's first denial of Pelletier's initial applications. (R. 449.) In order to permit a holistic review of both sets of applications, the Appeals Council vacated the ALJ's decision on the 2004 applications and also directed the Judge to determine whether conditions were met for reopening the 2007 applications. (Id.) The Appeals Council directed the ALJ "to reconcile the contradictory outcomes" and noted its concern that the agency had seemingly ignored the evidence of substance abuse when it granted the 2007 applications. (R. 449-50.) The conflict arose from the fact that the ALJ had found Pelletier disabled based on abuse of alcohol, which reduces the threshold for seizures, whereas Maine Disability Determination Services had found Pelletier disabled based on an epilepsy listing, without evaluating whether substance abuse was a contributing factor material to that finding. (Id.) The remand order directed the ALJ to, among other things:

> Further evaluate the claimant's substance addition disorder in accordance with the special technique[;] . . . [and] [d]ocument application of the technique in the decision by providing specific findings and appropriate rationale for each of the functional areas . . . .
>
> Obtain evidence from a medical expert to clarify whether the claimant's impairments meet or equal the severity of an impairment listed in Appendix 1 . . . absent consideration of the limiting effects of substance abuse.
>
> Give further consideration to the claimant's maximum residual functional capacity during the entire period at issue and provide rationale with specific references to evidence of record in support of assessed limitations . . . . In so doing, evaluate the non-examining source opinion . . . and explain the weight given to such opinion evidence.

(R. 450.)

---

[2] This start date was determined by dint of the fact that it was the day after the date of decision on the first applications rather than any expert assessment of the appropriate start date.

Further background is supplied by the applicable listings. Listing 11.02 is met with a showing of "convulsive epilepsy (grand mal or psychomotor), documented by detailed description of a typical seizure pattern, including all associated phenomena" which occurs "more frequently than once a month in spite of at least 3 months of prescribed treatment" and involves either "daytime episodes (loss of consciousness and convulsive seizures)" or "nocturnal episodes manifesting residuals which interfere significantly with activity during the day." Listing 12.09 is also implicated by the Judge's decision. Listing 12.09 is met with "behavioral changes or physical changes associated with the regular use of substances that affect the central nervous system" if the level of severity meets other specified listings, including the listing for seizures, which circles back to listing 11.02. The only dispute concerning the listing question is whether the frequency of seizures exceeds one per month and, if so, whether that was due to Pelletier's use of alcohol.

In addition to the listing considerations, as a matter of law, "alcoholism" and "drug addiction" cannot pave the way to disability benefits. 42 U.S.C. §§ 423(d)(2)(C), 1382c(a)(3)(J); 20 C.F.R. §§ 404.1535, 416.935. According to statute: "An individual shall not be considered to be disabled for purposes of this title if alcoholism or drug addiction would (but for this subparagraph) be a contributing factor material to the Commissioner's determination that the individual is disabled." 42 U.S.C. § 423(d)(2)(C), 1382c(a)(3)(J). Prior to passage of the amendment adding this provision, Pub. L. No. 104-121, 110 Stat. 852-56 (1996), the regulatory approach was to find a claimant disabled and refer the claimant for appropriate treatment of drug addiction or alcoholism. 20 C.F.R. §§ 404.1536, 416.936. That regulatory approach has been superseded by the amendment. Jackson v. Barnhart, 60 Fed. Appx. 255, 256 n.1 (10th Cir. 2003) (not for publ'n). This statutory and regulatory framework is applied by the Commissioner to

5

preclude an award of benefits when substance "abuse" is a contributing factor necessary to a finding of disability. E.g., Parra v. Astrue, 481 F.3d 742, 744 (9th Cir. 2007); Gonzalez v. Sec'y of HHS, 360 Fed. Appx. 240, 242 (2d Cir. 2010) (not for publ'n); Mirabile v. Comm'r of Soc. Sec., 354 Fed. Appx. 619, 621 (3d Cir. 2009) (not for publ'n). The Commissioner's regulations state that the Administration will assess "whether we would still find you disabled if you stopped *using* drugs or alcohol." 20 C.F.R. §§ 404.1535(b)(1), 416.935(b)(1) (emphasis added). Pelletier has not argued here that alcohol abuse or even use (as compared with alcoholism or addiction) would not fall under this statutory scheme. Nor has he argued that a consulting expert cannot assess a material issue of alcohol abuse absent evidence of a preexisting diagnosis of alcoholism or addiction or treatment for the same.

In addition to these provisions concerning substance abuse, there is a regulatory requirement that applicants or recipients of disability benefits follow prescribed treatment if treatment will restore the ability to work. 20 C.F.R. §§ 404.1530, 416.930. A claimant may fail to follow prescribed treatment if there is a good reason for doing so, but the regulatory examples of good reasons do not include a desire to consume alcohol. Id. §§ 404.1530(c), 416.930(c). When alcohol use or abuse results in a disabling level of impairment due to its interference with prescribed medication, a desire to use alcohol is not a "good reason" for not following a treatment regime. The Commissioner maintains a ruling associated with failure to follow prescribed treatment that raises an issue over development of a claim involving failure to follow treatment. Soc. Sec. Ruling 82-59 (S.S.A. 1982), 1982 SSR Lexis 25, *2-3, 1982 WL 31384. *1-2. The Judge did not cite this ruling in her decision and Pelletier has not advanced it, either. I assume for purposes of this case that when a substance is used or abused on a recurrent basis and it interferes with a treatment regimen, thereby resulting in disability, it is properly evaluated

6

under sections 404.1535 and 416.935 rather than 404.1530 and 416.930, particularly as Congress has enacted legislation to preclude a regulatory regime that would award benefits or rehabilitation services for substance abuse.

B. Evidence

The longitudinal record demonstrates a severe epilepsy condition involving multiple monthly seizures, despite medication. Pelletier has been diagnosed as having epilepsy since an early age, but he alleges an onset of disability in his 30s. According to the Judge, the current refractory nature of Pelletier's epilepsy is due to Pelletier's abuse of alcohol, with periods of binge drinking. (R. 21.) She assessed a listing-level substance addiction disorder and concluded that substance abuse was contributory to the frequency of seizure episodes. (R. 22.) She also found that Pelletier had failed to introduce persuasive evidence that, absent substance abuse, his condition would not be "well controlled" by the treatment regime. (R. 25.) The question is whether these findings are supported by substantial evidence.

The Judge cited ample evidence in support of a finding that Pelletier was abusing alcohol between the February 2003 alleged onset date and 2005 and that evidence is not reiterated here. (R. 22-23, citing Exs. 1F, 2F, 3F, 11F.) At oral argument, Pelletier's counsel asserted that it is "clear" that alcohol abuse no longer played a role in Pelletier's seizures from November 2005 onward. In fact, counsel suggested that, if the Court were to order a remand, it might well limit further review to consideration of the evidence subsequent to November 2005, effectively foreclosing benefits for the period between February 2003 and November 2005.

In June 2006, Pelletier received a vagal nerve stimulator (VNS) implant, which has been beneficial. His condition is also treated with prescriptions of anticonvulsants (Carbatrol and Topomax). Ativan (Lorazepam) is additionally prescribed to help pretermit seizures when they

7

start. (Ex. 16F, R. 381, 383.)

There is a note signed by a nurse practitioner in September of 2006 stating that Pelletier continues to consume alcohol, allegedly "one time a month, 3-4." (Ex. 18F, R. 528.) At this visit, Pelletier reported three to four seizures monthly and it is noted: "Admits to ETOH and knows this lowers the seizure threshold." (R. 526.) Thereafter, in November 2006, a physician's note reports "in October a single seizure." (R. 530.) Notes through February 27, 2007, do not indicate any new concerns related to seizures and report an allegation of drinking only once per month, suggesting the possibility of a period of relative sobriety, medication compliance, and reduced symptoms, though this is not a necessary inference. (R. 531-42.) A note signed in June of 2007 has a report of a May hospitalization for seizures after a period of not having seizures. (Ex. 27F, R. 682.) An October 2007 record indicates a report that Pelletier consumed in excess of five drinks in a 24-hour period between three and eleven times over the preceding three-month period. Pelletier reported going out once weekly to drink four to five beers, which would correlate with four times monthly (between three and eleven). (R. 685.) An August 2009 note contains a report of a visit to the ER in July for a seizure and a blood test that demonstrated a low Carbatrol level. (R. 698.) Pelletier reported being seizure-free for a month and a half prior to that episode. (R. 699.) This note indicates that "sometimes patient binge drinks, he knows this is self-destructive behavior." (Id.)

In May 2005, David Houston, Ph.D., performed a psychiatric review technique (PRT) indicating the absence of a severe psychological disorder. (Ex. 4F, R. 188.) The notes accompanying this assessment state that "substance abuse is a problem," but a finding of substance addiction disorder was not indicated. (R. 200.) A physical residual functional capacity assessment from the same time period assesses a capacity for non-hazardous, medium-

exertion work, notes "some major issues . . . about his alcohol use, in '03," and flags poor compliance with seizure therapy "aside from the alcohol." (James Hall, Ex. 5F, R. 207.) Additional comments identify multiple indications of missed medication and alcohol use in conjunction with ER visits. (R. 209.)

In August 2005, Maine Disability Determination Services requested a further PRT from Dr. Scott Hoch following a request for reconsideration. (Ex. 6F, R. 210.) Dr. Hoch assessed the presence of a "substance addiction disorder" under listing 12.09(I), which cross-references listing 11.02 for seizures. (R. 218.) Dr. Hoch concluded that there would be marked limitations in activities of daily living, maintaining social functioning, and maintaining concentration, persistence, and pace, and that there was evidence of three episodes of decompensation. (R. 220.) However, Dr. Hoch prepared a second PRT assessing "no medically determinable impairment" in the absence of "12.09," meaning no additional psychiatric impairment was demonstrated by the record. (Ex. 7F, R. 224, 236.) Dr. Richard Chamberlin conducted a physical residual functional capacity assessment, also secondary to the request for reconsideration. Dr. Chamberlin found a restriction to medium-exertion work and cautioned against working in proximity to heavy machinery and unprotected heights. (Ex. 8F, R. 242.) Dr. Chamberlin included the following note concerning symptoms: "This client does not meet the requirements for listing level seizure disorder in that there has not been a clearly documented three month period of compliance with medication and documented seizure occurrence at the frequency required." (R. 243.)

In November 2005, Pelletier attended an EEG video monitoring study at Dr. Feoli's request, spending approximately four days in the hospital. "From the admission on, his anticonvulsants were tapered down to 0 and he became off anticonvulsants on November 16,

9

2005." (Ex. 9F, R. 246.) Pelletier had three seizures during this hospital stay and the EEG results were reviewed to discern the brain activity involved in the seizure process and evaluate the same to see whether Pelletier is a good candidate for surgery.[3] (R. 246, 252-56.) In a note associated with this inpatient stay, Dr. Feoli reported that Pelletier has both petit mal seizures and grand mal seizures. The latter last roughly five to ten minutes, usually result in urinary and fecal incontinence, and leave Pelletier with severe postictal confusion. According to the note, the frequency of these seizures is two or three per year. (R. 248.) The petit mals are described as occurring once monthly. The duration is 15 seconds to a minute and usually there is no resulting confusion or incontinence. (Id.) As a result of the EEG and Dr. Feoli's recommendation, Pelletier opted to accept the VNS implant.

Pelletier's initial hearing date was December 13, 2006, but there was no further consulting expert review prior to that hearing, or expert testimony at the hearing, despite Dr. Feoli's EEG report and the VNS. The Judge issued her initial, unfavorable decision on February 12, 2007. In connection with Pelletier's second round of applications in April 2007, Maine DDS again referred the medical records to Dr. Houston for application of the PRT. In July 2007, Dr. Houston assessed the presence of a severe affective disorder (dysthymia). (Ex. 22F, R. 634, 637.) Dr. Houston did not check off the boxes for a listing-level substance addiction disorder based on seizure activity, but he did indicate that a "medically determinable impairment is present that does not precisely satisfy the criteria above," which he identified as "substance abuse." (R. 642.) He filled out a mental residual functional capacity assessment form, indicating mild and moderate limitations due to dysthymia. (Ex. 23F, R. 648-49.) Dr. Houston wrote that

---

[3] Pelletier emphasizes this study and suggests it proves his case because he was not drinking while at the hospital for this evaluation and yet experienced multiple seizures. The argument is not sound, however, because Pelletier was weaned off his anticonvulsant medications for purposes of the study making this a period in which he was not receiving medications.

Pelletier "is depressed secondary to physical difficulties. There is a question of substance abuse." His narrative comments otherwise assess a capacity for simple instructions, tasks, and changes, but not a capacity for public interaction. (R. 650.) Dr. Iver Nielson conducted a physical residual functional capacity assessment to round out the review. Dr. Nielson concluded that continuation of seizures subsequent to the VNS implantation supported a listing-level seizure disorder and described Pelletier's credibility as good. His comments do not include any indication of the evidence of alcohol abuse found in the medical records and noted by the other consulting physicians. (Ex. 24F, R. 659.)

In addition to the foregoing evidence, the Judge considered the opinions of Dr. Feoli and the testifying expert, Dr. Peter Webber. Dr. Feoli opined that Pelletier would experience marked limitations in a number of areas, including in areas of understanding and memory, concentration and persistence, social interaction, and adaptation. He reported this on a medical source statement form for mental impairment. (Ex. 28F, R. 701.) Dr. Feoli's narrative comment reads: "Patient has chronic refractory epilepsy and he is on medications for it—medications and epilepsy/seizures cause most if not all of the above mentioned cognitive issues, they may not all be present at the same time." (R. 702.) This follows on a residual functional capacity questionnaire specific to seizures, which Dr. Feoli completed in September 2006, prior to the initial administrative hearing. (Ex. 15F, R. 377.) In that form, Dr. Feoli indicated an average frequency of one seizure per month. (Id.) He reported "postictal manifestations" involving confusion, exhaustion, and muscle strain lasting 30-45 minutes, as well as fatigue for the balance of the day. (R. 378.) Dr. Feoli further stated that "over the last 2-4 months under medication and VNS doing well." (Id.) In answer to the question whether the patient suffers side effect of medication, Dr. Feoli wrote "no." (R. 379.) He also indicated an answer of "no" in relation to

11

whether the patient suffers from ethanol-related seizures. (Id.) Dr. Feoli predicted two or three unscheduled breaks weekly lasting 30 to 60 minutes and absences from work of about four days monthly. (R. 380.)

On remand from the Appeals Council, Judge Morgan conducted a second administrative hearing on September 10, 2009. At that hearing, Pelletier testified that he continues to consume alcohol on occasion, though he did not describe consumption at presumptively abusive levels. (R. 734.) The Judge then elicited expert testimony from Peter Webber, M.D. Dr. Webber testified that alcohol consumption impacts epilepsy by lowering the threshold for seizures. (R. 737.) Dr. Webber suggested that Pelletier be queried concerning the October 2007 note reporting weekly drinking of four or five drinks. (Id.) Counsel for Pelletier asked whether he had made such a report to the care provider and Pelletier denied it, explaining that it was not something he could afford. (R. 739.) From there, Pelletier's credibility suffered from evasive responses related to marijuana consumption, which he similarly denied despite contrary indications in the medical records.[4] (R. 740-41.) Otherwise, Pelletier reported that Ativan is about 75 percent effective in stopping emerging seizures and that the VNS has been a significant help, reducing the frequency of seizures from what had previously been about four or five a month to "at least two a month average." (R. 746-47.) Thereafter, the Judge's questioning returned to Dr. Webber. Dr. Webber testified that the records through 2005 indicated seizures of a "frequent nature," but also that alcohol played "a significant role." (R. 747-48.) When asked to consider the more recent evidence of record, Dr. Webber testified that Pelletier "has a definite impairment," but that the frequency of the seizures has dropped and, judging from the treatment notes, is probably less than one seizure per month. (R. 749.) Dr. Webber noted the reports

---

[4] Dr. Feoli has considered prescribing Marinol based on Pelletier's report that marijuana benefits his anxiety and also "because of his severe epilepsy." (Ex. 26F, R. 665.) The record divulges marijuana consumption, but nothing in the record supports a finding that marijuana interferes with Pelletier's medications.

12

suggesting continued alcohol use, but his testimony ended shortly thereafter following a statement that the record does not contain significant evidence of a separate psychological condition. (R. 750.)

C. Discussion

Pelletier's statement of errors faults the Judge's reliance on the 2005 opinion of Dr. Hoch, who assessed a listing-level impairment based on listing 12.09 (substance addiction disorders). According to Pelletier, Dr. Hoch's early PRT opinion has been eclipsed by Dr. Nielson's[5] physical RFC opinion. (Statement of Errors at 11-13.) In this regard, Pelletier argues that the Judge erred in finding substance abuse disorders; that finding of such a disorder necessarily relies on an independent review of raw medical evidence; and that she erroneously discounted Dr. Feoli's opinion that Pelletier's epilepsy is refractory to treatment. (Id. at 13-19.)

The standard of review is whether substantial evidence supports the Commissioner's findings. 42 U.S.C. §§ 405(g), 1383(c)(3); Manso-Pizarro v. Sec'y of Health & Human Servs., 76 F.3d 15, 16 (1st Cir. 1996). Substantial evidence is evidence that a reasonable mind might accept as adequate to support a finding. Richardson v. Perales, 402 U.S. 389, 401 (1971); Rodriguez v. Sec'y of Health & Human Servs., 647 F.2d 218, 222 (1st Cir. 1981). "The ALJ's findings of fact are conclusive when supported by substantial evidence, but they are not conclusive when derived by ignoring evidence, misapplying the law, or judging matters entrusted to experts." Nguyen v. Chater, 172 F.3d 31, 35 (1st Cir. 1999).

1. *Dr. Hoch's assessment*

Pelletier contends that the Judge erred because she failed to appreciate that Pelletier's condition was not the same throughout the entire period under consideration and that Dr. Hoch's PRT was later eclipsed by Dr. Houston's later review of the seizure evidence. (Statement of

---

[5] Pelletier's Statement of Errors mistakenly refers to the Nielson opinion as the Trumbull opinion.

13

Errors at 11-12.) The aim of this argument is to discredit the Hoch PRT of May 2005 (the exclusive opinion finding a listing-level "substance addiction disorder"). While it is true that the medical evidence does not depict a uniform level of impairment from 2003 through 2009 or a uniform course of treatment (*e.g.*, Pelletier received the VNS in 2006), it does not necessarily follow that an expert opinion offered mid-stream cannot afford a foundation for an administrative law judge to draw similar findings based on later-introduced evidence.

Dr. Hoch's second PRT offers the opinion that the record does not disclose an independent affective or anxiety disorder. This opinion is reinforced and brought up to date by Dr. Webber's hearing testimony, notwithstanding Dr. Houston's contradictory assessment of a dysthymic disorder. The Judge's finding that a severe dysthymic disorder is not demonstrated is supported by substantial evidence in the form of her review of the record (which does not include any treatment for psychiatric conditions) combined with Dr. Hoch and Dr. Webber's supportive expert assessments.

As for Dr. Hoch's singular identification of the section 12.09 listing, perhaps Pelletier would be onto something if it were essential for the treatment record to disclose a preexisting diagnosis of a "substance addiction disorder." However, Pelletier has not argued that a non-examining consultant cannot introduce a listing assessment under section 12.09 absent a preexisting substance addiction or alcoholism diagnosis. Moreover, as previously explained in the background discussion, a finding of substance abuse is adequate to enable an evaluation of the contributory impact of substances on the disability determination. Dr. Hoch was not the only consultant to flag substance abuse. Dr. Houston also flagged substance abuse, in the context of both the earlier set and the later set of applications. Additionally, Dr. Webber testified to the materiality of Pelletier's continued use and abuse of alcohol. Consequently, even if the Court

assumes that "alcoholism" or "substance addiction disorder" is not a proper diagnosis to draw from the longitudinal record, alcohol abuse or at least significant and regular alcohol use is amply demonstrated and is sufficient to implicate regulations 404.1535 and 416.935. The materiality of this level of use is also adequately demonstrated by notations in the treatment records and by Dr. Webber's testimony. Although the record does not suggest that Pelletier's seizures have an organic cause that exists only due to prolonged alcoholism, the record does indicate "physical changes associated with the regular use of substances that affect the central nervous system," Listing § 12.09, because regular alcohol use lowers the threshold for seizures.

*2.     Balance of the evidence*

The medical evidence evolved notably in November 2005 with the EEG study and also in 2006 with the VNS implantation. Dr. Feoli's expert opinion on the seizure questionnaire did not enter the record until 2006, subsequent to Dr. Hoch's review. Most recently, Dr. Feoli has supplemented his opinion with an assessment describing the mental residuals of seizure episodes. The parties do not dispute that the weight of the evidence demonstrates that Pelletier has experienced seizures at a sufficient frequency to trigger listing 11.02. The question is what degree of impairment would exist if Pelletier abstained from alcohol and did not periodically miss medication doses. Pelletier has the burden on this issue and the record of impairment that he has developed is based on the impairment that would arise secondary to a seizure episode, which would differ depending on whether the seizure was best described as grand mal or petit mal. Pelletier has also introduced conflicting statements from his treatment provider about the side effects of medication.

Dr. Webber testified that the post-VNS medical records reflect seizure activity occurring less frequently than monthly and the Judge reliably posited that Pelletier's epilepsy is not

refractory to treatment except insofar as Pelletier continues to abuse alcohol. The Judge made credibility findings and reviewed the longitudinal record to reliably find that alcohol use is ongoing. The Judge also observed that Pelletier's records do not reliably indicate that his alleged seizures occur when he has therapeutic levels of medications in his blood, as Dr. Feoli has not routinely ordered blood tests. At the time of the EEG monitoring, Dr. Feoli noted that the grand mal seizures were occurring approximately two or three times per year. Earlier records involving medical intervention secondary to severe seizure activity divulge the influence of alcohol abuse. Subsequent to the VNS implantation, Dr. Feoli reported that Pelletier was "doing well" and denied the existence of side effects from medication. This record invites somewhat polarized findings. On the one hand, the weight of the evidence indicates that alcohol abuse will impair functioning sufficiently to preclude substantial gainful activity. On the other hand, abstinence from alcohol and compliance with medication more likely than not would enable Pelletier to engage in substantial gainful activity, as he did prior to his onset date. There is guesswork entailed in this process and credibility assessments about seizure frequency and alcohol use also color the picture. The Judge, permissibly in my view, addressed the problem as follows: "The undersigned finds no persuasive evidence upon which to base a conclusion that the claimant's seizure disorder would not be well-controlled if he were to adhere to treating source directions regarding medication usage and abstinence from substance abuse." (R. 25.) If Pelletier's epilepsy is well-controlled, there is nothing in the record to suggest that he does not have an RFC that would allow for substantial gainful activity. Based on my own review of the record in this case, I cannot identify any reversible error in the Judge's approach and conclude that the evidence of record might well be accepted as adequate to support this ultimate finding.

## Conclusion

For the reasons set forth in the foregoing discussion, I RECOMMEND that the Court affirm the Commissioner's final decision and enter judgment in favor of the Commissioner.

NOTICE

A party may file objections to those specified portions of a magistrate judge's report or proposed findings or recommended decisions entered pursuant to 28 U.S.C. § 636(b)(1)(B) for which *de novo* review by the district court is sought, together with a supporting memorandum, within fourteen (14) days of being served with a copy thereof. A responsive memorandum shall be filed within fourteen (14) days after the filing of the objection.
Failure to file a timely objection shall constitute a waiver of the right to *de novo* review by the district court and to appeal the district court's order.

/s/ Margaret J. Kravchuk
U.S. Magistrate Judge

July 18, 2011